```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF TENNESSEE

 3                         AT CHATTANOOGA
      ------------------------------------------------------------
 4                                  :
      UNITED STATES OF AMERICA,     :
 5                                  :
              Plaintiff,            :
 6                                  :
      v.                            :         1:06-CR-75
 7                                  :
      MATTHEW BROCK,                :
 8                                  :
              Defendant.            :
 9    ------------------------------------------------------------
                                       Chattanooga, Tennessee
10                                     December 15, 2011

11

12            BEFORE:  THE HONORABLE CURTIS L. COLLIER,
                       CHIEF UNITED STATES DISTRICT JUDGE
13
      APPEARANCES:
14

15            FOR THE PLAINTIFF:

16            GREGG L. SULLIVAN
              Assistant United States Attorney
17            1110 Market Street, Suite 301
              Chattanooga, Tennessee  37402
18

19            FOR THE DEFENDANT:

20            HALLIE H. McFADDEN
              Law Office of Hallie H. McFadden
21            Post Office Box 546
              Signal Mountain, Tennessee  37377
22

23

24                        REVOCATION HEARING

25
```

1              THE CLERK:  Criminal Action 1:06-75, United States of

2     America versus Matthew Brock.

3              (Brief pause.)

4              THE COURT:  Counsel, please make appearances for the

5     record.

6              MR. SULLIVAN:  Gregg Sullivan on behalf of the United

7     States, Your Honor.

8              MS. McFADDEN:  Hallie McFadden for Mr. Brock, Your

9     Honor.

10              THE COURT:  The Court has received a report from the

11    probation office alleging that Mr. Brock has violated the terms

12    of his supervision.  The report indicates that Mr. Brock was

13    sentenced by this Court in April of 2007 for bank fraud.  He

14    received a sentence of 37 months' imprisonment.  He was placed

15    on supervised release for five years.  He was ordered to pay

16    $1.38 million in restitution.

17              The presentence report indicates that the

18    defendant's alleged violations are Grade C and Grade B

19    violations, Grade B being the most serious, and his criminal

20    history category is a I, which results in a guideline

21    imprisonment range of 4 to 10 months.

22              The report indicates that the defendant has been

23    disregarding the conditions of his supervision.  The report

24    indicates that he makes false statements to his probation

25    officer, that he's defrauded his former employer, that he

travels outside the district without the permission of the

probation officer, and that he has failed to make restitution

as ordered.  Ms. McFadden--  Let me ask Mr. Brock first.

        Mr. Brock, have you received a copy of this report

from the probation office --

        THE DEFENDANT:  Yes.

        THE COURT:  -- alleging that you violated the terms

of your supervision?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  Did you have a chance to read the report?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  Did you have adequate time to discuss the

report with Ms. McFadden?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  Ms. McFadden, did you receive a copy of

the report alleging Mr. Brock has violated the terms of his

supervision?

        MS. McFADDEN:  I did, Your Honor.

        THE COURT:  Did you have adequate time to discuss it

with him?

        MS. McFADDEN:  Yes, Your Honor.

        THE COURT:  After discussing the report with him,

does he admit, or does he deny, that he has violated the terms

of his supervision as alleged?

        MS. McFADDEN:  Your Honor, he admits several of the

1    violations.  He admits the violations with respect to the
2    restitution payment, as well as some of the violations with
3    respect to false statements to the probation officer, which
4    would be the Grade B violation.
5            There are several -- there are so many listed that
6    either he has no memory of so he can't admit or deny as well
7    as some that I believe are misunderstandings.  However, as far
8    as the restitution and as far as the untruthful information to
9    the probation officer, he admits those.
10           THE COURT:  How about traveling outside the district
11   without permission?
12           MS. McFADDEN:  There is one occasion when he did do
13   that.  He went to Brentwood, Tennessee, to see his son play
14   ball.
15           THE COURT:  And he did not obtain permission?
16           MS. McFADDEN:  He did not, Your Honor.
17           THE COURT:  Mr. Sullivan?
18           MR. SULLIVAN:  Yes, Your Honor.
19           THE COURT:  Ms. McFadden indicates that Mr. Brock
20   admits some of the allegations, others he does not admit.  It
21   may be he's not contesting them.  I think she indicated he does
22   not recall some.  So what's the government's pleasure?
23           MR. SULLIVAN:  Judge, I think that he's made
24   sufficient admissions to trigger the Court to take appropriate
25   action.  He's been on supervised release for about two years,

1    submitted a number of monthly reports, submitted a number of

2    additional documents to the probation officer, and in general,

3    Judge, the problem that we've had with Mr. Brock is that, given

4    the sizeable amount of restitution he was ordered to repay, he

5    has failed to accurately and fully disclose the income he has

6    received that's coming in to both he and his wife and also the

7    expenditures that are going out.

8            It's made it very difficult--  And if I have a few

9    moments later on, I'll highlight some of the issues.  It's

10   made it very difficult for the United States to obtain even a

11   minimal amount of restitution to help the victims of

12   Mr. Brock's crimes.

13           THE COURT:  What is the maximum term of imprisonment

14   the Court can impose?

15           MR. SULLIVAN:  The maximum term, I believe, Judge,

16   was 10 years.  I think he received a sentence of 37 months and

17   he got another 12 months' early release for participating in an

18   alcohol abuse program while he was in the Bureau of Prisons.

19           THE COURT:  So I could sentence him to how much?

20           MR. SULLIVAN:  The maximum --

21           THE COURT:  Seven years?

22           MR. SULLIVAN:  Oh, Judge, I'm sorry.  You can

23   sentence him to a maximum of three years at this point.

24           THE COURT:  Thirty-six months?

25           MR. SULLIVAN:  Yes, sir.

1          THE COURT:  Very well.

2          The Court, then, will make a finding that Mr. Brock

3    has violated the terms of his supervision.  And the Court must

4    determine what is the appropriate disposition to make of that

5    finding.

6          The Court will provide Ms. McFadden and Mr. Brock a

7    chance to speak to the Court to assist the Court in that

8    regard.

9          Ms. McFadden, would you, or Mr. Brock, like to speak

10   first?

11         THE DEFENDANT:  Your Honor, I'd like for my attorney

12   to speak for me.

13         MS. McFADDEN:  Your Honor, I'm standing here next to

14   Mr. Brock, and I have no sympathy for him, and I have no

15   sympathy for his family.  What he did is despicable.  The

16   problem that we're coming up against today, Your Honor, is,

17   what is the right thing to do.  And the Court has to deal with

18   sentencing determinations on a daily basis.  And the Court

19   looks to 3553(a) for guidance, what the appropriate factors are

20   for sentencing.

21         One of the things that struck me the most about this

22   is that Mr. Brock, when he was in prison, paid $25 a month.

23   Since he's been out, he's paid more.  Granted, he hasn't paid

24   what the probation officer has told him to.  And I'll come

25   back to that in a moment.  But if we send him back into

custody, the only goal of sentencing that is achieved is

punishment for Mr. Brock.  What it does is, punishes

Mr. Brock, but it punishes the victims more.

Mr. Brock now has a very, very good job where he's

earning a significant amount of money.  He has the potential

over the next several years to earn upward of a hundred to two

hundred thousand dollars.  He's worked with the manager, Tom

Peoples.  And Mr. Peoples will tell you he's a good employee,

he's reliable, he's honest.  He knows about his background,

and is willing to let him work with him.  He would -- like I

tell you, said he would be willing to tell you that this man

has the potential to make a significant amount of money, which

would translate to a significant amount of restitution to

victims.

If Mr. Brock goes to prison, he won't have that job,

and therefore, Your Honor, he would make whatever -- $25 a

month would be what he would be making toward restitution

while he's in prison.  And this Court knows full well what

economic times are like.  Mr. Brock may be able to find a

decent job, but the chances are very, very slim he's going to

come out and get the kind of job he's got now.

His boss has informed me that if the Court were to

order higher amounts of money, he would be responsible for

making sure Mr. Brock got the money to the Court, to the

government, to make sure the victims got recompensed.  There

1  have been some issues about Mr. Brock's payments, and, quite

2  frankly, there is no excuse for it.  However, I think

3  Mr. Brock, being very naïve about the legal system, didn't

4  understand -- even though she told him, didn't understand that

5  the probation officer was actually speaking for the Court.  He

6  has his judgment, and he thinks that's what the Court said.

7  Ms. Shields has told him that she speaks for the Court, but I

8  think someone who is new to the legal system--  I think he

9  gets it now.  He's standing here in front of you.  I think he

10  gets it now.

11          THE COURT:  Did you represent him at his sentencing?

12          MS. McFADDEN:  I did not.

13          THE COURT:  Mr. Brock, I don't want you to answer

14  this to me.  I want you to tell Ms. McFadden, and I want

15  Ms. McFadden to tell me.  But oftentimes when I have a

16  white-collar defendant in front of me for sentencing I will

17  make a point to share with them my experience on how

18  white-collar defendants do on supervised release.

19          Of all defendants, including drug defendants, they

20  do the worst on supervised release, because I don't think they

21  respect the position of the probation office, and they give

22  probation officers an awful lot of trouble, they have a great

23  deal of difficulty paying restitution.  So oftentimes I make

24  it a point to discuss that with them at the time that they're

25  sentenced, so they're not hearing it from the probation

officer, they're hearing it from me.  I also tell them that I will be displeased if while they're on supervised release I hear they're having some difficulty or they're giving my probation officers trouble.

          Would you see if Mr. Brock recalls that conversation that I would have had with him?

          (Off-the-record discussion.)

          MS. McFADDEN:  He doesn't believe so, Your Honor.  This was a few years ago, but he says he doesn't believe so.

          After my conversations with Mr. Brock, Your Honor, I tend to believe him, because, the things that he's told me about what's happened, I truly believe he was naïve about the legal system.  If you said it to him, he didn't hear it.  But I believe him when he tells me he didn't get that conversation with you.

          THE COURT:  Go on.

          MS. McFADDEN:  Thank you, Your Honor.  So, like I said, I think he understands that now.  I think that your probation officer will get no more problems from him, and whatever she tells him, he will understand is gospel and is coming from the Court and not somebody he feels doesn't understand him or get him; it's coming from the Court.

          Like I said, he has a tremendous amount of potential to make money.  One of the big issues, I think, is that his son is at McCallie, and McCallie is a quite expensive school.

And I think that one of the factors in setting the restitution was the fact that he had a son in private school. Most recently I think the Court has a report of violation of Mr. Brock receiving a 9200-dollar bonus from his employer that was used to pay McCallie.

I spoke with Mr. Peoples about that——that's his employer——and Mr. Peoples informed me that his son and Mr. Brock's son are very, very good friends, and go to McCallie together. They're such good friends, he takes family trips with Mr. Peoples. And he did not want to see Mr. Brock's son not be able to get the educational opportunities. And his intention was that that money was to go to McCallie, not to Mr. Brock in any way, shape, or form. And, in fact, the entire amount of that money did go to pay McCallie.

Mr. Peoples informed me had he realized it would be an issue, it would have gone straight to McCallie. I said that's kind of getting around it, except it's not. It was not $9200 Mr. Brock could have put in his pocket or used for something else. It was $9200 that was going to go to McCallie. It was done as an altruistic gesture, not toward Mr. Brock but Mr. Brock's son.

I know there has been an issue because he hasn't understood that 1900-dollar number. Ms. Shields has tried to make it very clear, I believe. I spoke to Ms. Shields about

1    it.  I read the reports.  I think it was like Your Honor says;

2    he's a white-collar defendant, and he's had a hard time

3    adjusting to this.  I don't think it's going to happen again.

4    But like I said, I think if the Court orders him, has this

5    conversation with him, he understands that it's coming from

6    you, not just Ms. Shields, out of some random number.

7            With that said, Your Honor, there are lots of ways

8    you can punish Mr. Brock.  You can put him in prison again;

9    but my position is that that doesn't punish Mr. Brock nearly

10   as much as it punishes the victims.  Like I said, Your Honor,

11   Mr. Brock has dug his own grave, you know, built his own

12   problems, and he's done it for his family.

13           THE COURT:  Well, one of the victims, though, here is

14   the Court.

15           MS. McFADDEN:  Yes, Your Honor.

16           THE COURT:  I think you're talking about the victims

17   of his fraud.  But by lying to the probation office, by leaving

18   the jurisdiction without my permission, by doing some of these

19   other things, he's showing disrespect and disregard for the

20   Court.  So the Court is also the victim --

21           MS. McFADDEN:  That's correct, Your Honor.

22           THE COURT:  -- of his actions.

23           MS. McFADDEN:  I was addressing—I'm sorry—the

24   monetary concerns.

25           THE COURT:  And by "the Court," I'm not speaking of

1    myself personally; I'm speaking of myself as a representative

2    of the judiciary.  And that means that Mr. Brock is showing

3    disrespect and disregard for the people of the United States by

4    disrespecting the orders and expectations placed upon him by

5    their representative in the judiciary, this Court.

6         MS. McFADDEN:  I understand that, Your Honor.  And,

7    consequently, he would be showing disrespect to me.  I don't

8    think that ever occurred to Mr. Brock.

9         Again, it's a lapse in judgment or lapse in--  It's

10   a naïveté that wasn't realized.  I think the leaving the

11   jurisdiction was -- as he says, it was 45 minutes outside of

12   the jurisdiction, to see his son play ball.

13        And, quite frankly, I hate to say this, and I hope

14   I'm never in that position, but if it were my children, I'd

15   possibly disrespect the Court.  Hopefully I'm never in that

16   position and it doesn't come down to it.  But that's one of

17   those things where maybe as a mother I understand that a

18   little bit better.

19        But I do understand the Court's position, and I do

20   agree with the Court, by disrespecting the Court orders, he

21   disrespected the Court and the people.  Again, I don't think

22   it was out of malice.  I don't think it was done with any

23   intentional disrespect, "I can do what I want because Judge

24   Collier -- I don't care what Judge Collier says."  I don't

25   think it was done in that manner.  I think it was done out of

1   naïveté and ignorance.

2          THE COURT:  His desires were more important than the

3   Court's desires.

4          MS. McFADDEN:  I think his naïveté and ignorance

5   played into that quite a bit, Your Honor.

6          Anyway, the Court can punish Mr. Brock by giving him

7   house arrest, by putting him in custody on the weekends, by

8   putting him in the halfway house.

9          The only thing that we would ask this Court is, not

10  to put him in jail or prison for an extended period, because

11  if he does that, he will lose his job, and the victims -- the

12  monetary -- the financial victims in this matter will lose

13  whatever opportunity to get as much as they can in recompense

14  and compensation for his wrongdoing.

15         THE COURT:  Mr. Brock, I take it that you do not

16  desire to say anything?

17         (Off-the-record discussion.)

18         THE DEFENDANT:  That's correct, Your Honor.

19         THE COURT:  Mr. Sullivan?

20         MR. SULLIVAN:  Judge, just a couple of things.  First

21  of all, the defendant wrote letters to his wife, while he was

22  still in prison, about how he was going to avoid, to the extent

23  possible, paying the restitution that had been ordered by this

24  Court, talking about the fact "they can only take 10 percent,

25  and that's all they'll get."

1    THE COURT:  And he's not been paying the 10 percent.

2    MR. SULLIVAN:  Judge, finally, when he wasn't making

3 the appropriate payments and he was ordered to pay 10 percent

4 plus another $1900 a month, the $1900 a month reflected the

5 cost of the McCallie tuition that he voluntarily chose to

6 spend.

7    Probation officer's response to that was, "If you

8 want to send your son to a private school, that's fine, but

9 you've got to make up that cost.  That money can't go into

10 McCallie versus the victims' pockets.  You've got to make sure

11 that you still have the money to flow to the victims'

12 pockets."

13    So he was ordered to pay that.  He did not.  As a

14 result, after a few months, Judge, we switched over from a

15 voluntary payment system to garnishment.  And I'll get to the

16 garnishment in just a minute.  But Mr. Peoples, his employer

17 for a period of time--  The United States has spent a

18 considerable amount of time, through its financial litigation

19 unit, and also the Court has spent a considerable amount of

20 time, through the probation officer's time, to make sure that

21 he's paying what he should pay.

22    The United States Attorney's Office finally got a

23 garnishment in place to take his money involuntarily from him

24 through Mr. Peoples' work.  And if I understand it correctly,

25 Judge, shortly thereafter Mr. Peoples informed the United

1    States that he had been fired from that company.

2            Shortly thereafter he was reemployed by another

3    company that looks like Mr. Peoples is still involved in it,

4    although it is through a different name.  That brings us to

5    the 9500-dollar bonus that Mr. Brock received.  He was

6    duty-bound to report that to his probation officer.  He did

7    not.

8            Ms. McFadden just said all that money went to

9    McCallie.  It did not.  The bonus was $9500.  He made a

10   9200-dollar payment to McCallie.  I don't know where the other

11   300-dollar payment went, but that was money that was subject

12   to garnishment.  And the way the check was cut out of this

13   company run by Mr. Peoples evaded the garnishment order of the

14   Court and the United States' opportunity to attach that money.

15   That's one thing.

16           The second thing is, just focusing on McCallie for a

17   second, not to pick on it, it's a great school, but Mr. Brock

18   has committed to spend $80,000 for a McCallie education for

19   his son.  He's received about $20,000 in financial aid,

20   leaving him on the hook for about $60,000.  Presently he owes

21   that school about $12,000.  Altogether he's made $48,000 in

22   payments to McCallie, and $30,000 of that money came from an

23   IRA that Mr. Brock had, that he dissipated, drained funds

24   from, shortly after he got out of prison and on probation.

25   $30,000, Judge, by the time the United States tried to

1 garnishee that money out of that account, it had been drained

2 dry, so another effort that was frustrated in terms of trying

3 to capture back the money for the victims in this case.

4          THE COURT:  I take it he did not disclose to the

5 probation office that he was withdrawing that money?

6          MR. SULLIVAN:  Judge, the first month that he was

7 out, he did not disclose it on his probation report.  The next

8 month he simply indicated that he had an IRA, did not provide

9 the bank information or the account information or the balance.

10          The month after that, he disclosed that he had an

11 IRA, and the outstanding balance, I believe, was a little over

12 $9000.  So the money had already been drained down to that.

13 Within a couple of months, the United States tried to grab

14 what was left in the account, and we were too late.

15          The other point that I made, Judge, is, you know, we

16 did a couple of modifications, and Ms. Shields has worked with

17 this man for about two years, trying to own up to his

18 responsibilities and the Court's orders against him, and he

19 has continually frustrated her efforts to do that.  She looked

20 at the income that he and his wife were receiving, and

21 compared it to IRA living standards.

22          Judge, over the four-year period or

23 three-and-a-half-year period that he's been out, given the

24 fact that he's living rent-free right now in a house owned by

25 Mr. Peoples --

         1          THE COURT:  Do you have any idea what the fair market

         2    value would be of that house?

         3          MR. SULLIVAN:  Judge, we'd love to find that out.

         4    We've made inquiry of that of the owners of the property, and

         5    they tell us they have no records with regard to our inquiries.

         6    So we've been frustrated there.

         7          THE COURT:  Do you know what houses in the

         8    neighborhood go for?

         9          MR. SULLIVAN:  Judge, we've got a laptop here, and we

        10    can do a quick appraisal for you while I'm speaking, if that's

        11    all right.

        12          So he's living rent-free, Judge, utilities included.

        13    He's getting a 500-dollar automobile allowance through his

        14    job, $500 in cash that he can put in his pocket for a vehicle.

        15    He's got the use of a business credit card; and the charges on

        16    that show that he's using it for incidental expenses, not just

        17    business-related.  So his cost of living is dramatically

        18    reduced by virtue of the type of employment arrangement that

        19    he has right now through this company.

        20          In spite of that, we looked at the IRA living

        21    standards, and, Judge, Ms. Shields indicated that basically

        22    over the time period that he's been out, he had about 113,000

        23    dollars' available income that could have gone towards

        24    restitution.  Over that period of time he has paid 25,000,

        25    leaving a balance --

1          THE COURT:  Over a three-year period?

2          MR. SULLIVAN:  Three-and-a-half-year period, Judge.

3          THE COURT:  Three-and-a-half-year period.  So he's

4    paid $25,000.

5          MR. SULLIVAN:  Yes, sir.

6          (Off-the-record discussion.)

7          MR. SULLIVAN:  About a three-and-a-half-year period,

8    Judge, $25,000.  At that rate, these people will never see

9    even, you know -- they'll see a fraction of what Mr. Brock

10   stole from them, but not much else.  And, Judge, basically what

11   her calculations reveal based upon the IRA living standards

12   was, he had $89,000 that could have been or should have been

13   available to go towards these victims, that did not.  We've

14   tried restitution, Judge.  We've upped the restitution.  In

15   fact, I think that there is a proposed order in your chambers

16   right now, just waiting for signature and review, to up the

17   restitution that he has.

18         Mr. Brock consistently, since Ms. Shields has been

19   working with him, has failed to live up to his financial

20   obligations.  This dispositional report was filed back in May.

21   He's had almost seven months', Judge, fair warning about these

22   exact charges, the nature of the problems.  And instead of

23   providing, voluntarily, any money to Ms. Shields, not one

24   dime, not one dime.  It's all been through garnishment.  Again

25   and again and again she has asked him to pay what he should

1 towards these victims, and has received nothing, nothing, from

2 Mr. Brock. So the victims continue to go unredressed. The

3 Court's orders are violated.

4 　　　　Ms. Shields told me that she has been a probation

5 officer for several years, Mr. Brock is one of the most

6 frustrating supervisees she has ever had, she is at her wit's

7 end with him, in terms of noncompliance.

8 　　　　Judge, right now I think the only thing that's going

9 to get Mr. Brock's attention is a period of incarceration.

10 I'm sorry to say that, but I think that's where we're at.

11 　　　　THE COURT: Ms. McFadden, I'll give you a chance to

12 respond. Mr. Sullivan is going to try to find out what the

13 houses in the neighborhood in which Mr. Brock resides go for.

14 　　　　Let me share with you some of my past experience.

15 I've told you that I have found in my time on the bench that

16 white-collar defendants are the most difficult ones. And I

17 recall a case where a defendant was living in -- I think the

18 house was appraised for about $700,000, rent-free; wasn't

19 paying anything for it. He was driving, I believe, a Lincoln.

20 His wife was driving, I think, a Lexus. And they were taking

21 trips outside of the district.

22 　　　　And the victims were individuals in that case, not

23 institutions. And the victims saw all this wealth being

24 flaunted. And the defendant always said, "Well, I have no

25 money. I cannot pay restitution off. I can't do anything."

1  You can imagine what type of taste that left in the mouths of

2  the victims.

3         Now, that's not the case with Mr. Brock.  Obviously

4  he's a different person.  But the Court has experienced so

5  many instances of people in Mr. Brock's position that just

6  have great difficulty complying with the conditions of their

7  supervision and obeying their probation officer.

8         What I'm inclined to do is to just write off the

9  restitution, just assume that there is nothing we're going to

10  be able to do to get Mr. Brock to voluntarily pay restitution,

11  that the only way the restitution is going to be paid is

12  through the government using its collection efforts to get it.

13  And that being the case, the Court would be inclined to put

14  him back in jail for the maximum amount I can.  That's 36

15  months?

16         MS. McFADDEN:  Yes, sir.

17         THE COURT:  And if I put him in jail for 36 months, I

18  don't believe I can put him back on supervised release.  But I

19  think that, dealing with white-collar defendants, who are very

20  intelligent, who are very experienced, who have had important

21  positions in the past, their disregard for the Court and

22  disrespect for the Court manifests itself by a long time period

23  of violations, and they just never take it to heart that this

24  is something that they should want to do, that we'd actually

25  have to use force to get it, and we're just not set up to use

1    force to get people on supervised release to pay.

2           You asked what would be the purpose of this other

3    than punishment. He's not the first white-collar defendant

4    I've seen. He's not going to be the last white-collar

5    defendant I'm going to see. And I think that the next

6    white-collar defendant I see is also going to have great

7    difficulty in paying restitution. I hope in the back of their

8    mind is, "Well, what happened to Mr. Brock may happen to me if

9    I don't pay restitution." So that is the purpose that would

10   be served by putting Mr. Brock in jail for the longest period

11   that we can.

12          And we have institutions here, but people work in

13   those institutions. It may be that some of the people that

14   trusted Mr. Brock, that made loans, that were deceived, might

15   be still out there, and they may know where Mr. Brock lives.

16   I don't know that. They may. They may know what Mr. Brock is

17   doing. They may realize that their institution is not

18   receiving any restitution at all.

19          By putting him back in jail, they won't go by his

20   house and see him living there, they won't see him driving

21   around town in his automobile, they won't see him using his

22   expense account. So incapacitation also serves an important

23   public function here. So that's what I'm inclined to do.

24          I'll give you a chance to respond to Mr. Sullivan's

25   remarks and also to the Court's information.

1          MS. McFADDEN:  Mr. Sullivan made several, several

2    comments.  I think, though, in light of, really, what the

3    Court's concern is, the restitution and the lack of respect for

4    the court system, the probation officer, it's really not worth

5    the bickering over the small details that we disagree with.

6          Your Honor, I disagree with the Court in the sense

7    that you're never going to get rest- -- that the people

8    wouldn't get restitution.  I think there is a very good chance

9    the people would get restitution if Mr. Brock keeps working.

10         THE COURT:  So there's been a change in heart, right?

11         MS. McFADDEN:  I'm sorry?

12         THE COURT:  There's been a change in heart?

13         MS. McFADDEN:  There has been a realization, maybe

14   not so much a change in heart, but a realization of what could

15   happen, the Court could punish him and make the penalty -- and

16   put the punishment such that other people--  I'm not naïve

17   enough to say I think if he weren't standing here today he'd

18   be--  You know, if he wasn't facing consequences, there

19   wouldn't be a change of heart.  There is a change of heart

20   because there is consequences.  And I don't think he had any

21   concept of the type of consequences he faced.  I don't think

22   anybody, until they actually face the consequences, has any

23   concept of what they could do.

24         The Court has authority to do what the Court is

25   inclined to do.  I just think that it would be cheating the

1  victims, because I do think that Mr. Brock has the potential

2  to make money and to--  If these numbers are correct, they

3  could live off Mrs. Brock's income.  It might not be

4  comfortable, but that's fine.  They could live off of

5  Mrs. Brock's income.  So a total forfeiture of income, even.

6          But for him not to be able to work deprives the

7  institutions, the banks, the people that he dealt with, of any

8  chance of getting anything back, and I think that would be a

9  tragedy, Your Honor.  And I would ask the Court to reconsider

10 its inclination.

11         THE COURT:  Okay.  Mr. Sullivan, have you found what

12 the houses are going for in that area?

13         MR. SULLIVAN:  Judge, we were not able to come up

14 with a figure for the Court based upon the research that we

15 were able to do in court today.  So we don't have that

16 information.  I can tell you this:  The defendant, at one

17 period of time, lived on Lookout.  And I think at that point in

18 time he was claiming rent was $1300 a month.  He's now in a

19 residence in Dalton, Georgia.  I would expect it would be less

20 than that, but I have no idea how much.

21         (Off-the-record discussion.)

22         MR. SULLIVAN:  Oh, I'm sorry, Judge.  Ms. Shields is

23 informing me that the house he's in presently is twice as large

24 as the house on Lookout Mountain, so the rent would be even

25 higher than it was.

```
 1              THE COURT:  Do you know what the square footage is?
 2              MR. SULLIVAN:  I'm sorry?
 3              THE COURT:  Do you know what the square footage of
 4    the house is?
 5              MR. SULLIVAN:  Ms. Shields is telling me she thinks
 6    it's somewhere close to 4000.
 7              THE COURT:  Four thousand square feet of living
 8    space?
 9              MR. SULLIVAN:  And --
10              MS. McFADDEN:  Who wants to live in Dalton, Your
11    Honor?  The value has got to be a lot less.
12              Sorry.
13              THE COURT:  A 4000-square-foot house, though,
14    anyplace, is going to be a pretty good -- pretty valuable
15    house.
16              Mr. Sullivan, do you have any comments about the
17    Court's stated inclination?
18              MR. SULLIVAN:  Judge, quite frankly, I hadn't
19    considered that as an option.  But, you know, even if Mr. Brock
20    were to make double the amount of restitution that he's made to
21    date, moving forward, at the end of 20 years you're still
22    looking at a drop in the bucket for the $1.4 million that he
23    defrauded people.  So I think that there is a wisdom to the
24    Court's analysis.  I think Mr. Brock would be an example,
25    obviously not to Mr. Brock, to never do this again, but perhaps
```

1    other white-collar defendants.

2            It's not like, Judge, he hasn't been given

3    opportunity after opportunity after opportunity to fly right.

4    He just hasn't taken advantage of those opportunities.

5            THE COURT:  Thank you.

6            Anything further, then?

7            MS. McFADDEN:  No, Your Honor.

8            THE COURT:  Mr. Brock, this is the first time that

9    I've had occasion to speak to you directly.  I'm not sure why

10   this is the case, but it is very, very common for very

11   intelligent people, very accomplished people, very educated

12   people who find themselves in trouble, come before the Court,

13   and have been put on supervised release, they just will not

14   comply with the terms of supervised release.

15           When I put someone on supervised release, I expect

16   them to obey each and every condition, and that's whether you

17   agree with the condition or not.

18           It was very important to you to go out of town to

19   see your son perform and accompany your son on a school trip.

20   I understand that.  It was very important to me, though, that

21   you stay within the confines of the Eastern District of

22   Tennessee without getting permission to leave.

23           When you're on supervised release, there are many

24   things that you may like to do that you cannot do.  And it may

25   be that family members suffer.  It may be that employers

suffer.  It may be that your church suffers.  It may be that
your friends suffer.  It may be that you suffer.  But I cannot
have defendants decide on their own that, "This is more
important to me to do than the Court's order," because each
and every defendant is going to have something that they
believe is more important than obeying the Court's order.

My probation officers are reasonable people.  They
care about the people they have under supervision.  And they
work very, very hard to see that the Court's orders are
carried out.  And I do not like to hear that one of my
probation officers has spent time upon time upon time upon
time getting someone to comply with the terms of supervision.
Someone on supervised release should be thankful that they're
not serving their time in jail.

I asked if you'd had a change of heart.  And that's
really what restitution is aimed to do.  It's not so much
punishment but to get you to understand that you've done
somebody else wrong and that you have an obligation to do as
much as you can to make things right by that person.  So, on a
regular basis, when you take money that you have and you give
it to one of your victims, that ought to be a gesture that
"I'm doing the right thing by making up for a crime that I
committed against someone who did nothing to cause that loss."

THE DEFENDANT:  (Moving head up and down.)

THE COURT:  So when someone tries to ignore or

violate or circumvent or get around that obligation, that tells
me that their heart is not in the right place.  And when your
heart is not in the right place, you'll look for ways to avoid
doing what's right.

        We cannot supervise someone who is not truthful with
us.  I understand that there were many instances when you lied
to your probation officer.  If I cannot trust what you tell me
about what you're doing, you really should not be out here on
the street; you ought to be in a place where we know what
you're doing; that means that you're back in jail.

        It is regrettable that as a result of your actions
the Court is going to put you in a position where you cannot
make restitution.  But the Court firmly believes that unless
you, in your heart, want to make restitution, it's like
getting blood from a turnip——we squeeze, and we fight, we beg,
and we may get a little bit here, we may get a little bit
there, but the result probably is not worth the effort.

        The Court thinks that for any class of defendants
where deterrence ought to make sense, it's to people like you.
You're intelligent.  You're educated.  You're experienced.
And, at least according to what Mr. Sullivan said, you're
calculating, you wrote to your wife about how you were going
to do certain things.  And people like yourselves ought to be
able to calculate that "If I do this, this might be the
result, and this is not a result we want to have, so I'm not

1  going to do this in the first place." So although the victims

2  may not be made whole here, future victims may be made whole,

3  because future defendants in your shoes will understand that

4  if they do the things that you've done, they're going to wind

5  up in the same place that you did.

6          The Court revokes the defendant's supervision. The

7  Court finds that the defendant has violated the terms of his

8  supervision, and the Court orders that he be committed to the

9  custody of the Bureau of Prisons for the maximum term

10 possible, which the Court understands is 36 months. The Court

11 understands this is above the policy statement guideline

12 range, but the Court believes that such a sentence is

13 necessary to reflect the callous disregard that this defendant

14 has displayed toward orders of this Court, the firm belief

15 this Court has that the defendant will never comply willingly

16 with conditions the Court has set, that such a sentence is

17 necessary to deter others who might be inclined to engage in

18 the same type of conduct that this defendant has engaged in,

19 that this sentence is necessary to incapacitate the defendant

20 so that his victims and employees of his victims will not see

21 the defendant living in a 4000-foot house -- what is it,

22 500-dollar-a-month car allowance?

23          MR. SULLIVAN: Yes, sir.

24          THE COURT: -- using a 500-dollar-a-month car

25 allowance. And that serves a societal purpose that the Court

```
 1   believes in this instance weighs against letting the defendant
 2   remain on bond with the remote possibility that he might make
 3   some restitution.
 4            Is there anything further we must do regarding
 5   Mr. Brock?
 6            (Off-the-record discussion.)
 7            MS. McFADDEN:  Your Honor, we would ask that he be
 8   allowed 30 days to self-report.  He does have children, and,
 9   granted, I understand he's done this to his family, but it is
10   the holidays, and we would ask the Court to allow him to have
11   one last Christmas with his family before he reports.
12            THE COURT:  How about reporting on Friday,
13   January 6th?
14            (Off-the-record discussion.)
15            MS. McFADDEN:  That's fine, Your Honor.  Thank you
16   very much.
17            THE COURT:  The Court orders the defendant to report
18   to the institution designated by 2:00 p.m. on Friday,
19   January 6, 2012.
20            MS. McFADDEN:  Thank you, Your Honor.
21            MR. SULLIVAN:  Judge, I understand that until then
22   the defendant remains on supervision?
23            THE COURT:  Yes.
24            THE DEFENDANT:  (Moving head up and down.)
25            MS. McFADDEN:  Thank you, Your Honor.
```

1          THE COURT:  Please call the next case.

2                      END OF PROCEEDINGS

3

4          I, Elizabeth B. Coffey, do hereby certify that I

5    reported in machine shorthand the proceedings in the

6    above-styled cause, and that this transcript is an accurate

7    record of said proceedings.

8

9

10

11                                    s/Elizabeth B. Coffey
                                      Elizabeth B. Coffey,
12                                    Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT